**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG**

**TINA M. PETERS,**
       **Plaintiff,**

**v.**                                 **Civil Action No.: 1:08-CV-203**
                                                **JUDGE KEELEY**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

       **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING
THAT THE DISTRICT COURT GRANT DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT [17], DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [12],
AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

## I.     INTRODUCTION

On November 14, 2008, Plaintiff Tina M. Peters ("Plaintiff"), by counsel Travis M. Miller,

Esq., of Bailey, Stultz, Oldaker & Greene, PLLC, filed a complaint in this Court to obtain judicial

review of the final decision of Defendant Michael J. Astrue, Commissioner of Social Security

("Commissioner" or "Defendant") pursuant to Section 205(g) of the Social Security Act, as

amended, 42 U.S.C. § 405(g). On January 29, 2009, the Commissioner, by counsel Helen Campbell

Altmeyer, Assistant United States Attorney, filed an answer and administrative transcript of the

proceedings. On February 27, 2009 and May 7, 2009, Plaintiff and the Commissioner filed their

respective Motions for Summary Judgment [12] [17]. On May 21, 2009, Plaintiff filed a rebuttal

memorandum [19]. Following review of the motions by the parties and the transcript of

administrative proceedings, the undersigned Magistrate Judge now issues this Report and

Recommendation to the District Judge.

## II.  RELEVANT PROCEDURAL AND FACTUAL BACKGROUND AND REVIEW OF ADMINISTRATIVE LAW JUDGE DECISION

### A.  Procedural Background

On November 14, 2005, Plaintiff applied for supplemental security income and disability insurance benefits, alleging disability as of April 30, 2003.  Tr. at 117 & 1208-09.  On August 30, 2007, the United States Administrative Law Judge ("ALJ") held a hearing ("ALJ Hearing"), and Plaintiff testified under oath.  Tr. at 1225-63.  *See* 20 C.F.R. § 404.929 (hearing before an administrative law judge).  In November 2007, the ALJ denied Plaintiff's application for disability. Tr. at 10-26.  In December 2007, Plaintiff requested a review of this unfavorable decision to the Appeals Council. Tr. at 9.  *See* 20 C.F.R. § 404.967 (Appeals Council review--general).  In October 2008, the Appeals Council denied Plaintiff's request for review.  Tr. at 3-5.  Plaintiff now requests judicial review of the ALJ decision denying her application for disability.

### B.  Standard for Judicial Review of a Decision by the Administrative Law Judge in a Disability Case

> Judicial review of a final decision regarding disability benefits is limited to determining whether the findings...are supported by substantial evidence and whether the correct law was applied. *See* 42 U.S.C. § 405(g).  "The findings...as to any fact, if supported by substantial evidence, shall be conclusive" *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *See Perales*, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938))...Substantial evidence...consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance...Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment...if the decision is supported by substantial evidence.  *See Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir.1962).  Ultimately, it is the duty of the

administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence. *King v. Califano*, 599 F.2d 597, 599 (4th Cir.1979). **"This Court does not find facts or try the case *de novo* when reviewing disability determinations."** *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir.1976); "We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of non-persuasion." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir.1972). "The language of the Social Security Act precludes a *de novo* judicial proceeding and requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"

*See Hays v. Sullivan*, 907 F.2d 1453 (4th Cir. 1990) (emphasis added). In applying these legal standards, the Court reviews the decision by the ALJ.

### C. Standard for Disability and Five-Step Evaluation Process

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work..."[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A). In order for the ALJ to determine whether a plaintiff is disabled and therefore entitled to disability insurance benefits, the Social Security Administration has established a five-step sequential evaluation process. The five steps are as follows (including Residual Functional Capacity Assessment prior to Step Four):

Step One:     Determine whether the plaintiff is engaging in substantial gainful activity;

Step Two:     Determine whether the plaintiff has a severe impairment;

Step Three:  Determine whether the plaintiff has "listed" impairment;

* Residual Functional Capacity Assessment *
(Needs to be Determined Before Proceeding to Step Four)

Step Four:  Compare residual functional capacity assessment to determine whether the plaintiff can perform past relevant work;

Step Five:  Consider residual functional capacity assessment, age, education, and work experience to determine if the plaintiff can perform any other work.

*See* 20 C.F.R. § 404.1520 (evaluation of disability in general).  In following the five-step process and coming to a decision, the ALJ makes findings of fact and conclusions of law.  This Court will review the decision by the ALJ to determine whether it is supported by substantial evidence, in accordance with 42 U.S.C. § 405(g) and *Hays*.

## D.  Review of ALJ Application of Five-Step Evaluation Process and Whether it is Supported by Substantial Evidence

### 1.  Step One: Determine whether the Plaintiff is Engaging in Substantial Gainful Activity

Substantial gainful activity is work activity that is both substantial and gainful:

(a) Substantial work activity. Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.

(b) Gainful work activity. Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized....

Generally, in evaluating your work activity for substantial gainful activity purposes, our primary consideration will be the earnings you derive from the work activity...

> If you are working and the work you are doing is substantial gainful activity, we will find that you are not disabled *regardless of your medical condition* or your age, education, and work experience.

*See* 20 C.F.R. § 404.1572; *see also* 20 C.F.R. § 404.1574(a)(1) (evaluation guide for employees who are not self-employed); *see also* 20 C.F.R. § 404.1520(b) (emphasis added). Subsequent to Plaintiff's alleged disability date of April 30, 2003, Plaintiff worked for three months as a part-time dishwasher / cook from June 2005 through August 2005. Tr. at 162. However, Plaintiff's earnings from this work activity were below the substantial gainful activity limit. Tr. at 15. The parties do not dispute ALJ's findings in Step One.

### 2. Step Two: Determine whether the Plaintiff has a Severe Impairment

> [A] severe impairment...is any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities...
>
> An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities. Basic work activities...mean[s] the abilities and aptitudes necessary to do most jobs. Examples of these include--1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting.

*See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521; *see also Luckey v. U.S. Dept. of Health & Human Services*, 890 F.2d 666 (4th Cir. 1989). The ALJ found Plaintiff to have the following severe impairments: residuals, status post surgery for mesenteric thrombosis with ischemic bowel; recurrent lower extremity cellulitis; bilateral varicose veins; residuals, status post incisional hernia repair; bronchial asthma; and obesity. Tr. at 15-16. The ALJ found that Plaintiff failed to establish a severe mental impairment. Tr. at 16. The parties do not dispute the ALJ's findings in Step Two.

*See* Pl. Doc. 12 at 16 (Plaintiff states that she has never claimed she was disabled due to any

psychological disorder).

### 3. Step Three: Determine whether the Plaintiff has a "Listed" Impairment

If you have an impairment(s) that meets or equals one of our listings in appendix 1 of [Subpart P of Part 404] and meets the duration requirement, we will find that you are disabled. *See* 20 C.F.R. § 404.1520(d).

The Listing of Impairments...describes...impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. *See* 20 C.F.R. § 404.1525(a).

Most of the listed impairments are permanent or expected to result in death. *See* 20 C.F.R. § 404.1525(a).

We need evidence from acceptable medical sources (e.g. licensed physicians) to establish whether you have a medically determinable impairment(s). *See* 20 C.F.R. § 404.1513(a).

To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies ***all of the criteria*** in the listing. *See* 20 C.F.R. § 404.1513(a) (emphasis added).

***An impairment that manifests only some of those criteria, no matter how severely, does not qualify***. *See Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885 (1990) (emphasis added).

#### a. Listing Impairment 3.03B Asthma With Attacks

Plaintiff contends that she meets or equals the criteria for Listing Impairment 3.03B, Asthma

with Attacks. Pl. Doc. 12 at 11-14. In order to satisfy the criteria for Listing Impairment 3.03B,

Asthma with Attacks, the Plaintiff must establish:

**3.03 Asthma. With:**

**A.** Chronic asthmatic bronchitis. Evaluate under the criteria for chronic obstructive pulmonary disease in 3.02A;

**OR**

**B. Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each inpatient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks.**

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.03 (emphasis added).

## 3.00 Respiratory System

A. ...Many individuals, especially those who have listing-level impairments, will have received the benefit of medically prescribed treatment. Whenever there is evidence of such treatment, the longitudinal clinical record must include a description of the treatment prescribed by the treating source and response in addition to information about the nature and severity of the impairment...

Unless the claim can be decided favorably on the basis of the current evidence, a longitudinal record is still important because it will provide information about such things as the ongoing medical severity of the impairment, the level of the individual's functioning, and the frequency, severity, and duration of symptoms. **Also, the asthma listing specifically includes a requirement for continuing signs and symptoms despite a regimen of prescribed treatment...**

Alterations of pulmonary function can be due to obstructive airway disease (e.g., emphysema, chronic bronchitis, asthma), restrictive pulmonary disorders with primary loss of lung volume (e.g., pulmonary resection, thoracoplasty, chest cage deformity as in kyphoscoliosis or obesity), or infiltrative interstitial disorders (e.g., diffuse pulmonary fibrosis)...Some disorders, such as bronchiectasis, cystic fibrosis, and asthma, can be associated with intermittent exacerbations of such frequency and intensity that they produce a disabling impairment, even when pulmonary function during periods of relative clinical stability is relatively well-maintained...

**C.** Episodic respiratory disease. **When a respiratory impairment is episodic in nature, as can occur with exacerbations of asthma, cystic fibrosis, bronchiectasis, or chronic asthmatic bronchitis, the frequency and intensity of episodes that occur despite**

**prescribed treatment are often the major criteria for determining the level of impairment.** Documentation for these exacerbations should include available hospital, emergency facility and/or physician records indicating the dates of treatment; clinical and laboratory findings on presentation, such as the results of spirometry and arterial blood gas studies (ABGS); the treatment administered; the time period required for treatment; and the clinical response. **Attacks of asthma**, episodes of bronchitis or pneumonia or hemoptysis (more than blood-streaked sputum), or respiratory failure **as referred to in paragraph B of 3.03**, 3.04, and 3.07, **are defined as prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting. Hospital admissions are defined as inpatient hospitalizations for longer than 24 hours. The medical evidence must also include information documenting adherence to a prescribed regimen of treatment as well as a description of physical signs. For asthma, the medical evidence should include spirometric results obtained between attacks that document the presence of baseline airflow obstruction...**

I. Effects of obesity. Obesity is a medically determinable impairment that is often associated with disturbance of the respiratory system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with respiratory impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00 Respiratory System (emphasis added).

The ALJ reviewed the medical evidence in the record to determine whether Plaintiff meets

or equals the requirements for Listing 3.03B. Tr. at 19.

### (1)     Medical Evidence in the Record Relevant to Listing 3.03B

On July 12, 2004, Plaintiff had a physical exam with Sobha Kurian, M.D., at the hematology / oncology department of West Virginia University Hospital. Tr. at 991-92. Dr. Kurian noted that Plaintiff had a history of asthma and her current medications included Advair and Albuterol inhaler and nebulizer. Tr. at 991-92. Plaintiff reported that she had no shortness of breath, and Dr. Kurian found that her chest and lungs were clear. Tr. at 991. Dr. Kurian advised that Plaintiff return in one year for follow-up. Tr. at 992.

On March 4, 2005, Plaintiff had a chest x-ray that revealed "no evidence of acute cardiopulmonary process." Tr. at 1021.

On September 20, 2005, Christopher Z. Villaraza II, M.D., of Grafton City Hospital evaluated Plaintiff for pain in her left leg. Tr. at 818-20. Plaintiff reported a history of asthma and that she uses Advair Diskus and Proventil MDI. Tr. at 818. Dr. Villaraza found that Plaintiff's chest and lungs were clear to auscultation bilaterally. Tr. at 818.

On September 30, 2005, Plaintiff went to the Grafton City Hospital emergency department for complaints of wheezing and coughing. Tr. at 867-70. She received nebulizer treatments and a Solumedrol injection and was discharged home in stable condition approximately one hour after being triaged. Tr. at 867-69.

On January 3, 2006, Plaintiff went to the Community Health Center with complaints of being sick with a cold, wheezing, and coughing. Tr. at 468. The health center assessed Plaintiff as having chronic bilateral leg pain and asthmatic bronchitis and scheduled a follow-up appointment in one month. Tr. at 468.

On February 2, 2006, Fulvio Franyutti, M.D., a State Agency Physician Consultant, reviewed

the record and concluded that Plaintiff could perform a range of light work.  Tr. 615-22.

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work...

20 C.F.R. § 404.1567(b).

On February 20, 2006, Plaintiff received nebulizer treatments for asthmatic bronchitis at the Tygart Valley Clinic.  Tr. at 431.  Later that day, Plaintiff went to Grafton City Hospital for asthmatic exacerbation, hypercoagulopathy, and migraine headaches.  Tr. at 450-53.  Nancy L. Haislip-Craig, M.D. treated Plaintiff with nebulizers and oxygen.  Tr. at 451.  Dr. Haislip-Craig prescribed Prednisone, Avelox, and respiratory treatments of Proventil, Atrovent, and Advair.  Tr. at 451.  Upon release from the hospital on February 23, 2006, Plaintiff's prognosis was good and her condition improved.  Tr. at 450-51.

On March 1, 2006, Plaintiff went to the Community Health Center for a checkup, and the health center assessed Plaintiff as having asthma, 1-2+ pitting edema, obesity, and recurrent cellulitis.  Tr. at 473-74.  The health center scheduled a follow-up appointment in two months.  Tr. at 473.  On March 3, 2006, Plaintiff went to the Tygart Valley Clinic for a hospital follow up.  Tr. at 430.  The clinic found that Plaintiff was asymptomatic and that the asthmatic bronchitis was resolved.  Tr. at 430.

On March 20, 2006, Harakh V. Dedhia, M.D., at the West Virginia University Pulmonary Clinic, evaluated Plaintiff for complaints of shortness of breath, asthma, and reduced overnight pulse

oximetry.  Tr. at 498.  Plaintiff reported being diagnosed with bronchial asthma when she was 10 years old.  Tr. at 498.  Plaintiff stated that she has shortness of breath with minimal exertion.  Tr. at 498.  She said that she has symptoms of wheezing and an occasional cough.  Tr. at 498.  Dr. Dedhia found that Plaintiff's lungs were clear upon physical examination.  Tr. at 499.  Plaintiff reported that her weight was 334 pounds and that her weight has been steadily increasing over the past few years.  Tr. at 498.  Dr. Dedhia noted that despite her history of asthma, she has never had formal pulmonary function tests done to substantiate this diagnosis.  Tr. at 498.  Dr. Dedhia found that Plaintiff is morbidly obese with a body mass index of 57.  Tr. at 499.  Dr. Dedhia opined that while Plaintiff may have bronchial asthma, it is likely that her obesity is the main contributing factor to her shortness of breath.  Tr. at 499.  Dr. Dedhia recommended referring Plaintiff to a sleep lab to determine whether she suffers from sleep apnea.  Tr. at 499.  Dr. Dedhia strongly counseled Plaintiff on the importance of embarking on weight loss program.  Tr. at 499.  Plaintiff said that she understood the benefits of weight loss and indicated that she was willing to undergo a weight loss program.  Tr. at 499.  Dr. Dedhia scheduled Plaintiff for a follow-up appointment in six weeks.  Tr. at 499.

On April 28, 2006, Plaintiff went to the Tygart Valley Clinic for complaints of wheezing, coughing, and congestion.  Tr. at 430.  She received Albuterol nebulizer breathing treatments and a Solumedrol injection.  Tr. at 430.  The assessment was asthmatic bronchitis, and Plaintiff had a pulmonology appointment scheduled for the next week.  Tr. at 430.

On May 1, 2006, Plaintiff went to a follow-up visit with John E. Parker, M.D., of the West Virginia University Pulmonary Clinic.  Tr. at 439-40.  Dr. Parker found that Plaintiff's lungs were clear to auscultation bilaterally.  Tr. at 439.  Dr. Parker reported that pulmonary function studies

revealed a pre-bronchodilator FEV1 of 2.76, which was 85 percent of predicted and a post-bronchodilator FEV1 of 3.04 liters. Tr. at 439. Dr. Parker did note that Plaintiff likely would have had a significant bronchodilator response if she had not been taking systemic corticosteroids, Advair, and Albuterol. Tr. at 439. Dr. Parker assessed that Plaintiff may have sleep apnea. Tr. at 439. Dr. Parker scheduled Plaintiff for a follow-up visit in six weeks. Tr. at 439.

On May 2, 2006, Plaintiff underwent a sleep study, and John A. Young, M.D. concluded that Plaintiff had no significant problem with sleep disordered breathing. Tr. at 437. Plaintiff reported to Dr. Young that she usually goes to bed between midnight and 1 a.m. and wakes up at 7 a.m. on a daily basis. Tr. at 437. Dr. Young noted that Plaintiff may be not getting enough sleep and this could account for her complaints of tiredness. Tr. at 437.

On June 21, 2006 and July 20, 2006, Plaintiff returned to the Tygart Valley Clinic for complaints of shortness of breath, wheezing, and coughing. Tr. at 206-07. She again received Albuterol nebulizer breathing treatments and Solumedrol injections. Tr. at 206-07.

On August 4, 2006, Cindy Osborne, D.O., a State Agency Physician Consultant, reviewed the evidence and noted Plaintiff's February 2006 hospitalization for asthmatic exacerbation. Tr. at 400. Dr. Osborne also commented on Plaintiff's May 2006 pulmonary function study, and she reported that the results were normal. Tr. at 400. Dr. Osborne concluded that Plaintiff's limitations were largely related to obesity. Tr. at 400. From the evidence in the record, Dr. Osborne opined that Plaintiff could perform a range of sedentary work, with certain additional postural and environmental limitations. Tr. 393-400.

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often

necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met...If someone can do light work, we determine that he or she can also do sedentary work.

20 C.F.R. § 404.1567.

On September 5, 2006, Plaintiff again returned to the Tygart Valley Clinic for complaints of shortness of breath.  Tr. at 205.  Plaintiff stated that she had been seen in the emergency department on each of the three previous days, but the record does not confirm these visits.  Tr. at 205; Comm'r Doc. 18 at 6-7; Pl. Doc. 12, Ex. 3.  The record is also not clear as to what treatment, if any, Plaintiff received on her September 5, 2006 visit to Tygart Valley Clinic.  Tr. at 205.

On March 7, 2007 at 11:57 p.m., Plaintiff went to the Grafton City Hospital emergency department for complaints of shortness of breath and wheezing.  Tr. at 275-78.  She received nebulizer treatments and a Solumedrol injection; and walked out of the emergency department in improved condition at 1:00 a.m., approximately one hour after being triaged.  Tr. at 275-78.

On March 26, 2007, Plaintiff received an evaluation from Manish Sharma, M.D., resident of West Virginia University Department of Medicine.  Tr. at 373-76.  Plaintiff reported that she had no complaints of shortness of breath or coughing and her lungs were clear upon physical examination.  Tr. at 375.

On May 8, 2007, May 21, 2007, and May 22, 2007, Plaintiff returned to the Tygart Valley Clinic for complaints of shortness of breath, wheezing, and coughing.  Tr. at 202-05.  The clinic diagnosed Plaintiff with asthmatic exacerbation and asthmatic bronchitis.  Tr. at 204.  She again received Albuterol nebulizer breathing treatments and Solumedrol injections, and her condition improved on all three occasions before she left the clinic.  Tr. at 202-05.  During the May 21, 2007 visit the clinic took a chest x-ray, which did not reveal any acute changes.  Tr. at 204.  The May 21,

2007 treatment notes also reflect that Plaintiff did not use her home nebulizer treatment before coming to the clinic.  Tr. at 204.

**(2)      The ALJ Considered whether Plaintiff Meets or Equals Listing 3.03B and the Effects of Plaintiff's Obesity**

Listing 3.03B requires that Plaintiff suffer from the type of asthma attacks described in Listing 3.03B and 3.00C.

> **3.03 Asthma. With:**
>
> **B.  Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year**.  Each inpatient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.03 (emphasis added).

> **3.00 Respiratory System**
>
> A. ...[T]he asthma listing specifically includes a requirement for **continuing signs and symptoms despite a regimen of prescribed treatment**...
>
> **C.  Attacks of asthma...as referred to in paragraph B of 3.03...are defined as prolonged symptomatic episodes lasting one or more days and requiring intensive treatment**, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting.  Hospital admissions are defined as inpatient hospitalizations for longer than 24 hours.  **The medical evidence must also include information documenting adherence to a prescribed regimen of treatment...For asthma, the medical evidence should include spirometric results obtained between attacks that document the presence of baseline airflow obstruction...**
>
> I. Effects of obesity. Obesity is a medically determinable impairment that is often associated with disturbance of the respiratory system, and disturbance of this system can be a major cause of disability in individuals with obesity.  The combined effects of obesity with

respiratory impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, **adjudicators must consider any additional and cumulative effects of obesity**.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00 Respiratory System (emphasis added).

Therefore, in order to satisfy the requirements of Listing 3.03B, Plaintiff needs to have suffered from 6 asthma attacks in 12 months; each attack must last one or more days; each attack must require intensive treatment; and the attacks must persist despite adherence to a prescribed regimen of treatment. In addition, the ALJ must consider the cumulative effects of Plaintiff's obesity. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 3.00 & 3.03B. After reviewing the record, the ALJ found that Plaintiff does not meet the criteria for Listing 3.03B. Tr. at 19.

Plaintiff lists 11 asthma related incidents in her medical history, including 1 hospital admission, which counts as 2 asthma attacks according to 3.03B. Pl. Doc. 12, Ex. 3. Plaintiff lists the following asthma incidents, which span beyond the 12 month time frame set forth in 3.03B: 9/30/05 - emergency room visit, 1 hour duration; 2/20/06 - clinic visit; 2/20/06 - 2/23/06 - hospital admission (counts as 2); 4/28/06 - clinic visit; 6/21/06 - clinic visit; 7/20/06 - clinic visit; 9/05/06 - clinic visit; 3/8/07 - emergency room visit, 1 hour duration; 5/8/07 - clinic visit; 5/21/07 - clinic visit; and 5/22/07 - clinic visit. *See* Pl. Doc. 12, Ex. 3; *see also* medical evidence *supra*, Section II.D.3.a.(1), of this Report and Recommendation. Plaintiff's asthma related incidents do not meet the criteria of Listing 3.03B, notwithstanding the visits outside of a 12 month time frame. The majority of Plaintiff's asthma related incidents did not last one or more days as required by 3.03B and 3.00 but instead were usually resolved in a matter of hours. The only incidents that lasted one

or more days were on 2/20/06 through 2/23/06 and possibly 5/21/07 through 5/22/07. The remaining incidents were resolved within about an hour's visit to the emergency room or clinic. Therefore, Plaintiff only suffered 3 asthma attacks that meet the severity of 3.03B, and those attacks were not within a 12 month time frame.

Listing 3.03B and 3.00 also requires that Plaintiff's attacks persist despite adherence to a prescribed regimen of treatment. The treatment notes from the May 21, 2007 asthma attack reflect that Plaintiff did not use her home nebulizer treatment before coming to the clinic. Tr. at 204. In addition, on March 20, 2006, Dr. Dedhia found that Plaintiff is morbidly obese with a body mass index of 57. Tr. at 499. Dr. Dedhia opined that while Plaintiff may have bronchial asthma, it is likely that her obesity is the main contributing factor to her shortness of breath. Tr. at 499. Dr. Dedhia strongly counseled Plaintiff on the importance of embarking on weight loss program. Tr. at 499. Plaintiff said that she understood the benefits of weight loss and indicated that she was willing to undergo a weight loss program. Tr. at 499.

The ALJ considered the cumulative effects of Plaintiff's obesity. Tr. at 19. The ALJ noted that Plaintiff's height is 65 inches and that Plaintiff's BMI places her in the category of "extreme" obesity. Tr. at 19. The ALJ found that despite her obesity, Plaintiff has been able to walk without an assistive device. Tr. at 19. In addition, the record cites many instances where Plaintiff was able to walk on her own when arriving and departing from the emergency room. Tr. at 275, 431, 450, & 867-68. In considering the cumulative effects of Plaintiff's obesity on her impairments, the ALJ cited Plaintiff's May 1, 2006 visit with Dr. Parker at the West Virginia University Pulmonary Clinic. Tr. at 19. Dr. Parker found that Plaintiff's lungs were clear to auscultation bilaterally. Tr. at 439. Dr. Parker reported that pulmonary function studies revealed a pre-bronchodilator FEV1 of 2.76,

which was 85 percent of predicted and a post-bronchodilator FEV1 of 3.04 liters. Tr. at 439. The ALJ also referenced Plaintiff's May 2, 2006 sleep study, which revealed no significant problem with sleep disordered breathing. Tr. at 19 (ALJ decision); Tr. at 437 (sleep study report).

The Commissioner notes that Plaintiff did not come forward with spirometric results obtained between attacks that documented the presence of baseline airflow obstruction. Comm'r Doc. 18 at 19. Plaintiff responds that 3.00C does not require the results. Pl. Doc. 19 at 5. While it is true that 3.00C does not require the results, the statute does say "should include," so the failure to come forward with spirometric results that document baseline airflow obstruction is a factor to be taken into account by the ALJ.

In Plaintiff's medical history, no treating, examining, or State Agency physician opined that she met or equaled the requirements of a listed impairment. The ALJ found that the overall record fails to establish that Plaintiff's combined impairments are of a level of severity to meet or equal the requirements of any listing impairment. Tr. at 19. Substantial evidence supports the ALJ's decision that Plaintiff does not meet or equal the criteria for Listing Impairment 3.03B.

### * Residual Functional Capacity Assessment * (Needs to be Determined Before Proceeding to Step Four)

> If your impairment(s) does not meet or equal a listed impairment, we will assess and make a finding about your residual functional capacity based on all the relevant medical and other evidence in your case record...We use our residual functional capacity assessment at the fourth step of the sequential evaluation process to determine if you can do your past relevant work...and at the fifth step of the sequential evaluation process (if the evaluation proceeds to this step) to determine if you can adjust to other work...

> Residual functional capacity assessment. Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is the most you can still do despite your

limitations. We will assess your residual functional capacity based on all the relevant evidence in your case record....

Residual functional capacity is a measurement of the most a claimant can do despite his limitations. *See* 20 C.F.R. § 404.1545(a). According to the Social Security Administration, residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Regulation (SSR) 96-8p. Residual functional capacity is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain). *See* 20 C.F.R. § 404.1529(a).

*See* 20 C.F.R. § 404.1520(e); *see also* 20 C.F.R. § 404.1545(a); *see also Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006). The ALJ reviewed Plaintiff's medical evidence, severe impairments, physical and mental limitations, pain symptoms, daily activities, and credibility; and from the entire record, the ALJ concluded that Plaintiff has the residual functional capacity to perform sedentary work. Tr. at 20. Specifically, the ALJ found that Plaintiff has the residual functional capacity to perform a range of sedentary work, with standing / walking for a total of two hours during the eight-hour workday. She can perform all postural movements occasionally, except she cannot climb ladders, ropes, or scaffolds. She must avoid even moderate exposure to fumes, dust, odors, gases, and pollutants and must avoid working around moving plant machinery and unprotected lights. Tr. at 20.

### a. Absenteeism

Plaintiff contends that she cannot work full-time because her frequent medical appointments would lead to constant absenteeism from work. Pl. Doc. 12 at 5. Plaintiff argues that her history of medical appointments demonstrates that she would be unable to work full-time. However, no doctor opined that Plaintiff is unable to work because of numerous doctor appointments. Plaintiff

does not rely on a medical opinion that she is unable to work due to frequent absenteeism, but instead she presents her history of appointments in support of her argument.

**(1)**        **Summary of Plaintiff's Medical History**

**(a)**        **Thrombosis**

From June 6, 2003 through June 30, 2003, Plaintiff was hospitalized due to mesenteric vein thrombosis with ischemic bowel. Tr. at 968. Plaintiff suffered a blood clot in her bowel and she had surgery to have six feet of "dead bowel" removed. Tr. at 968 & 971. The doctors prescribed Coumadin for anticoagulation. Tr. at 968. On February 23, 2004, Dr. Kurian evaluated Plaintiff and found her in no acute distress but decided to hospitalize her through February 25, 2004 because of possible transient ischemic attack (TIA) symptoms, low international normalized ratio (INR), and to resolve complications with her Coumadin treatment. *See* Tr. at 983-86.

On July 12, 2004, Dr. Kurian evaluated Plaintiff and found no further evidence of thrombosis since her surgery in June 2003. Tr. at 991. Dr. Kurian advised Plaintiff to continue Coumadin medication and return in one year for follow-up. Tr. at 992.

**(b)**        **Cellulitis**

On March 28, 2005 through March 30, 2005, Plaintiff was hospitalized for cellulitis in her right leg. Tr. at 996-97. She was treated with antibiotics and was able to walk on her right leg upon discharge. Tr. at 997. On July 30, 2005 through August 2, 2005, Plaintiff was hospitalized for left leg cellulitis. Tr. at 658-59. She was again treated with antibiotics and she was walking at the time of discharge. Tr. at 659.

On August 3, 2005 through August 6, 2005, Plaintiff was hospitalized for left leg cellulitis. Tr. at 1000-01. She was treated with antibiotics and her cellulitis was improved at the time of

discharge. Tr. at 1000-01. After discharge from the hospital, Plaintiff only took 1 dose of antibiotics due to nausea, and this caused her cellulitis to worsen. Tr. at 1004. On August 8, 2005 through August 10, 2005, Plaintiff was again hospitalized for left leg cellulitis. Tr. at 1004-05. She was treated with antibiotics and her cellulitis was improved at the time of discharge. Tr. at 1004-05. On October 5, 2005 through October 6, 2005, Plaintiff was again hospitalized for left leg cellulitis. Tr. at 795-812.

On March 26, 2006, Manish Sharma, M.D., evaluated Plaintiff and found no lesions or cellulitis in both legs. Tr. at 373-75. On May 2, 2007, Plaintiff was evaluated and the doctor noted a history of cellulitis but the examination revealed no calf tenderness or edema. Tr. at 364-67.

### (c)    Hernia

On November 6, 2006, Plaintiff underwent an incisional hernia repair. Tr. at 225. On November 28, 2009, Plaintiff experienced a coughing spell that caused her hernia surgical drain site to open, resulting in a wound. Tr. at 223. On January 3, 2007, Dr. Graves noted that Plaintiff's wound dehiscence was being treated by wound vac therapy. Tr. at 221. On January 31, 2007, the wound vac had been removed. Tr. at 215. On March 21, 2007, Dr. Graves noted that Plaintiff's wound was resolving. Tr. at 210-11. On May 2, 2007, Plaintiff reported that she was "feeling good," and Dr. Graves noted minimal drainage from the wound. Tr. at 208. Dr. Graves described the wound as "superficial" and that it had significantly decreased in size. Tr. at 209.

### (d)       Bronchial Asthma

For a detailed discussion on Plaintiff's history of bronchial asthma, *see supra*, Section II.D.3.a.(1), of this Report and Recommendation. The final records pertaining to Plaintiff's bronchial asthma reveal that on May 8, 2007, May 21, 2007, and May 22, 2007, Plaintiff returned to the Tygart Valley Clinic for complaints of shortness of breath, wheezing, and coughing. Tr. at 202-05. The clinic diagnosed Plaintiff with asthmatic exacerbation and asthmatic bronchitis. Tr. at 204. She received Albuterol nebulizer breathing treatments and Solumedrol injections, and her condition improved on all three occasions before she left the clinic. Tr. at 202-05. During the May 21, 2007 visit, the clinic took a chest x-ray, which did not reveal any acute changes. Tr. at 204. The May 21, 2007 treatment notes also reflect that Plaintiff did not use her home nebulizer treatment before coming to the clinic. Tr. at 204.

### (2)       Absenteeism Conclusion by the ALJ

Upon review of Plaintiff's medical history, several of her health problems appear improved or resolving, which would abrogate the need for many of her medical appointments. In addition, the majority of Plaintiff's appointments would not require her to miss a full day of work. Plaintiff cites the ALJ's hypothetical question to the Vocational Expert, as to whether there would be jobs available working 8 hours per day, 5 days per week if Plaintiff was frequently absent. Pl. Doc. 12 at 5; Tr. at 1261. The Vocational Expert testified that absenteeism and inconsistent hours would preclude all jobs. Tr. at 1261. However, this question by the ALJ was merely a hypothetical, and in his decision, the ALJ rejected Plaintiff's allegation that she is disabled due to absenteeism by concluding that Plaintiff is able to perform sedentary work 8 hours per day for 5 days per week. Tr. at 24. Substantial evidence supports the ALJ's finding that Plaintiff can work full-time.

### b.     Credibility of Plaintiff

Plaintiff contends that the ALJ failed to properly consider her credibility.  Pl. Doc. 12 at 14.

SSR 96-7P provides the standard for the ALJ to assess credibility.

> The regulations describe a two-step process for evaluating symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness:
>
> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms...
>
> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.  For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.  This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.  This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 C.F.R. § 404.1529(c)(4) and § 416.929(c)(4)...
>
> When additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements.  In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. §

404.1529(c) and § 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements: 1. The individual's daily activities; 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. Factors that precipitate and aggravate the symptoms; 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*See* SSR 96-7p (emphasis added).  The ALJ used the two-step process and factors in SSR 96-7p and 20 C.F.R. §§ 404.1529 and 416.929 in evaluating Plaintiff's credibility.  Tr. at 20.  The ALJ found that Plaintiff has medically determinable impairments that could reasonably be expected to cause some of the symptoms described.  Tr. at 20.  However, the ALJ did not find Plaintiff entirely credible based on evidence in the record.  Tr. at 20.

### (1) Plaintiff's Daily Activities

The ALJ reviewed Plaintiff's daily activities in assessing her credibility.  Tr. at 24.  At the ALJ Hearing, Plaintiff stated that she is married and has a 9 year old son.  Tr. at 1233.  Plaintiff states that she became disabled on April 30, 2003.  Tr. at 117 & 1208-09.  Plaintiff reported that following her alleged date of disability, from June 2005 through August 2005, she worked 30 hours per week as a dishwasher and short order cook.  Tr. at 108 & 162.  A dishwasher and short order cook is classified as medium work.  Tr. at 1259.  "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R.

§ 404.1567(c).

In December 2005, Plaintiff reported that her daily activities consisted of trying to make her husband and son something for dinner and trying to do what a wife and mother is supposed to do. Tr. at 152-53. Plaintiff stated that she had no problem with caring for her personal needs. Tr. at 153-54. Plaintiff cooks breakfast, lunch, and dinner daily for 1-2 hours depending on how she feels. Tr. at 154. Plaintiff does 2-3 hours of laundry and also performs dusting. Tr. at 154. Plaintiff visits her mother 4-5 times per week. Tr. at 155. Plaintiff can drive or ride in a car. Tr. at 155. Once a week she shops for food and necessities for a couple hours. Tr. at 155. Plaintiff is able to pay bills and handle a checking and savings account. Tr. at 155. Plaintiff watches TV every day and paints ceramics once a week. Tr. at 156. Plaintiff attends church and has helped with a bake sale. Tr. at 156. Plaintiff reported that she can lift 10-15 pounds and does not use any assistive device for ambulation. Tr. at 157-58. Plaintiff said she is able to pay attention and follow written and spoken instructions. Tr. at 157.

In March 2006, Plaintiff had a psychological evaluation with Martin Levin, M.A. Tr. at 652-55. Plaintiff told Mr. Levin that she typically arises at 7:00 a.m. to get her son off to school and then may go to appointments or around town or "veg out." Tr. at 654. Plaintiff reported that she performs housework, reads her Bible, and for fun she goes to a dinner and a movie with her husband. Tr. at 654. When her son comes home at 4:00 p.m., the family has dinner together and then Plaintiff helps her son with his homework. Tr. at 654. Plaintiff typically goes to bed at 11:00 p.m. and is able to take care of her own personal grooming. Tr. at 654. Plaintiff regularly attends church with her husband and son. Tr. at 654.

In September and October 2006, Plaintiff volunteered approximately 20 hours at a hospital

doing activities with the patients such as reading to them and putting calendars together. Tr. at 1237-38. The state public assistance program required this volunteer work. Tr. at 1238.

At the ALJ Hearing in August 2007, Plaintiff testified that she could routinely lift a gallon of milk, has no problems with her memory, tries to sweep and mop, and sleeps in a second floor bedroom. Tr. at 1249-50, 1256-57.

### (2)    Credibility Conclusion by the ALJ

The ALJ found that based on the evidence in the record, Plaintiff's complaints of disabling pain were not fully credible. Tr. at 24. Plaintiff states that the ALJ erred in finding that the doctors did not tell her to elevate her legs on a continual basis. Pl. Doc. 12 at 15. Plaintiff cites two instances where a doctor advised her to elevate her leg following treatment for cellulitis. Pl. Doc. 12 at 15; Tr. at 659 & 857. However, on May 2, 2007, Plaintiff was evaluated and the physician noted a history of cellulitis but the examination revealed no calf tenderness or edema. Tr. at 364-67. Therefore, the ALJ's finding that a doctor did not advise her to *continually* elevate her leg is based on substantial evidence.

The ALJ found that the residual functional capacity finding that Plaintiff can perform sedentary work fully accommodates any of Plaintiff's residual pain, impairments, limitations, and obesity. Tr. at 21-22 & 24. The ALJ further found that Plaintiff's daily activities are consistent with an ability to perform a range of sedentary work. Tr. at 24. Therefore, from the evidence in the record, substantial evidence supports the ALJ's finding that Plaintiff was not entirely credible.

### c.    Residual Functional Capacity Assessment Conclusion by the ALJ

The ALJ reviewed Plaintiff's medical evidence, severe impairments, physical and mental limitations, pain symptoms, daily activities, and credibility; and from the record, the ALJ determined

that Plaintiff has the residual functional capacity to perform sedentary work. Tr. at 20 & 24. The ALJ noted that this finding is consistent with the assessment by Dr. Osborne, the State Agency Physician Consultant. Tr. at 24 (ALJ decision); Tr. at 393-400 (Report by Dr. Osborne). Substantial evidence supports the ALJ's Residual Functional Capacity Assessment that Plaintiff can perform sedentary work.

**4.      Step Four: Compare Residual Functional Capacity Assessment to Determine whether the Plaintiff Can Perform Past Relevant Work**

> At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.
> 20 C.F.R. § 404.1520(a).
>
> Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it.
> 20 C.F.R. § 404.1560(b).
>
> Your impairment(s) must prevent you from doing your past relevant work. If we cannot make a determination or decision at the first three steps of the sequential evaluation process, we will compare our residual functional capacity assessment...with the physical and mental demands of your past relevant work. (See § 404.1560(b).) If you can still do this kind of work, we will find that you are not disabled.
> *See* 20 C.F.R. § 404.1520(f).

The ALJ found that Plaintiff is unable to perform her past relevant work as a nurse aid and certified nurse aid (CNA) because they are classified as work requiring medium physical exertion. Tr. at 24. The parties do not dispute the ALJ's findings in Step Four.

**5.      Step Five: Consider Residual Functional Capacity Assessment, Age, Education, and Work Experience to Determine if the Plaintiff Can Perform Any Other Work**

> At the fifth and last step...
>
> [i]f we find that your residual functional capacity is not enough to enable you to do any of your past relevant work, we will use the same residual functional capacity assessment we used to decide if you

> could do your past relevant work when we decide if you can adjust to any other work. We will look at your ability to adjust to other work by considering your residual functional capacity and your vocational factors of age, education, and work experience. Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (either in the region where you live or in several regions in the country).

*See* 20 C.F.R. § 404.1520(a); *see also* 20 C.F.R. § 404.1560(c). At the final step of the disability analysis, the ALJ considered Plaintiff's age, education, work experience, residual functional capacity assessment, and vocational expert testimony to determine whether Plaintiff could perform any other work.

The ALJ noted that Plaintiff was 30 years old on the date of the alleged disability, which makes her a younger individual as defined in the Social Security Act. Tr. at 24. *See* 20 C.F.R. § 404.1563 (age as a vocational factor). The ALJ found that Plaintiff has a high school education and that transferability of job skills is not an issue due to Plaintiff's age. Tr. at 24. *See* 20 C.F.R. § 404.1564 (education as a vocational factor); *see also* 20 C.F.R. § 416.968(d) (transferability of job skills).

Vocational Expert John Panza testified that someone with Plaintiff's residual functional capacity would be able to perform sedentary jobs that are unskilled. Tr. at 1260. Mr. Panza stated that Plaintiff could work as a surveillance system monitor operator, order clerk, or information clerk, and that there were at least 4,100 of these types of jobs available locally in West Virginia and 846,000 jobs available nationwide. Tr. at 1260.

The ALJ asked the Vocational Expert whether a person would be able to perform these types of jobs if he or she had to elevate his or her leg every half hour during the day. Tr. at 1262. Mr. Panza testified that this limitation would not preclude these jobs, and that they could be performed

by someone in a wheelchair.  Tr. at 1262.

After considering the Plaintiff's age, education, work experience, residual functional capacity assessment, and vocational expert testimony, the ALJ found that there are jobs that exist in the national economy that the Plaintiff could perform.  Tr. at 25.  Substantial evidence supports the ALJ's decision that Plaintiff could perform other work.

> Substantial evidence...consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance...Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment...if the decision is supported by substantial evidence.  *See Laws*, 368 F.2d at 642; *Snyder*, 307 F.2d at 529.  **Ultimately, it is the duty of the administrative law judge reviewing a case, and *not* the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence.** *King*, 599 F.2d at 599.  "This Court does not find facts or try the case *de novo* when reviewing disability determinations."  *Seacrist*, 538 F.2d at 1056-57; "We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of non-persuasion."  *Blalock*, 483 F.2d at 775.  **"The language of the Social Security Act precludes a *de novo* judicial proceeding and requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"**

*See Hays*, 907 F.2d at 1456 (emphasis added).  Therefore, this reviewing Court will uphold the ALJ's decision that Plaintiff could perform other work because it is supported by substantial evidence.

In conclusion, the ALJ found that based on the Plaintiff's application filed on November 14, 2005, the Plaintiff is not entitled to a period of disability, disability insurance benefits, or supplemental security income.  Tr. at 25.  The Court finds that substantial evidence supports the ALJ's decision that Plaintiff is not disabled and can perform other work in the national economy.

# III.    RECOMMENDATION AND CONCLUSION

The undersigned Magistrate Judge hereby **RECOMMENDS** that the District Court **GRANT** Defendant's Motion for Summary Judgment **[17]**, **DENY** Plaintiff's Motion for Summary Judgment **[12]**, and **AFFIRM** the Decision of the Administrative Law Judge.  The Court notes the Plaintiff's objections to the ruling.

Within ten (10) days of receipt of service of this Report and Recommendation, any counsel of record may file with the Clerk of the Court any written objections to this Recommendation.  The party should clearly identify the portions of the Recommendation to which the party is filing an objection and the basis for such objection.  The party shall also submit a copy of any objections to the Honorable John P. Bailey.  Failure to timely file objections to this Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon this Recommendation.  28 U.S.C. § 636(b)(1).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

**DATED: September 29, 2009**

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE