IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


TINA M. PETERS,

          Plaintiff,

v.                              CIVIL ACTION NO. 1:08CV203
                                     (Judge Keeley)


COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

          Defendant.


ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION


     Pursuant to 28 U.S.C. §636(b)(1)(B), Fed.R.Civ.P. 72(b), and

L.R. 4.01(d), on November 14, 2008, the Court referred this Social

Security action to United States Magistrate David J. Joel with

directions to submit proposed findings of fact and a recommendation

for disposition.

     On September 29, 2009, Magistrate Judge Joel filed his Report

and Recommendation ("R&R"), in which he directed the parties, in

accordance with 28 U.S.C. §636(b)(1) and Fed.R.Civ.P.  6(e), to

file any written objections with the Clerk of Court within ten (10)

days following receipt of the R&R. On October 8, 2009, the

plaintiff, Tina M. Peters ("Peters"), through counsel, Travis M.

Miller, filed objections to the magistrate judge's R&R.  On

November 6, 2009, counsel for the Commissioner responded to Peters'

objections

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

### I.  PROCEDURAL BACKGROUND

On November 14, 2005, Peters applied for supplemental security income ("SSI") and disability insurance benefits ("DIB"), alleging disability as of April 30, 2003 due to asthma, intestinal problems, leg problems and anxiety.  On August 30, 2007, an Administrative Law Judge ("ALJ") held a hearing at which Peters appeared and testified. On November 23, 2007, the ALJ determined that Peters was not disabled and issued an unfavorable decision.

In December 2007, Peters requested a review of the November 23, 2007 unfavorable decision of the ALJ. In October 2008, the Appeals Council denied her request for review. On November 14, 2008, Peters filed this action, seeking review of the final decision.

### II.  PLAINTIFF'S BACKGROUND

Peters was 30 years old on the date of the alleged disability and, pursuant to 20 C.F.R. § 404.1563, is considered a younger individual.  She has a high school diploma, is trained and licensed as a certified nurse's aide ("CNA") and has work experience as a nurse's aide and CNA.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

---

### III.   ADMINISTRATIVE FINDINGS

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ made the following findings:

1.   Peters met the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and was insured for benefits through June 30, 2005;

2.   Peters has not engaged in substantial gainful activity since the alleged onset of disability;

3.   Pursuant 20 CFR § 404.1520(c)and 416.920(c), Peters has the following impairments: residuals, status post-surgery for mesenteric thrombosis with ischemic bowel, recurrent lower extremity cellulitis, bilateral varicose veins, residuals, post-incisional hernia repair, bronchial asthma, and obesity that are considered to be severe but, alone or in combination, do not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1;

4.   Peters has the residual functional capacity to perform a range of sedentary work with the following restrictions: standing or walking for a total of two hours during the eight-hour workday; sitting for a total of six hours during the workday; no climbing ladders, ropes or scaffolds; moderate exposure to fumes, dust, odors, gases and pollutant; and no exposure to moving plant machinery or unprotected heights;

5.   Peters is unable to perform any of her past relevant work (20 CFR § 404.1565);

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

6.    Peters is considered a "younger individual age 18-44" (20 CFR § 404.1563);

7.    Peters has "a high school education" and is able to communicate in English (20 CFR § 404.1564);

8.    Transferability of skills is not material to the determination of disability due to Peters' age (20 CFR § 404.1568 and 416.968);

9.    Based on age, education, work experience and residual functional capacity, there are a significant number of jobs in the national economy that Peters can perform (20 CFR §404.1560(c), 404.1566, 416.960(c) and 416.966); and

10.   Peters was not under a "disability," as defined in the Social Security Act, from April 20, 2003 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## IV.  **PLAINTIFF'S OBJECTIONS**

Peters asserts that the magistrate judge erred in determining that the record contained substantial evidence to support the ALJ's findings regarding her

1)    residual functional capacity ("RFC");

2)    failure to meet the criteria of Listing 3:03(B); and

3)    credibility.

## V.  **MEDICAL EVIDENCE**

The record included the following relevant medical evidence:

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

1.    A June 30, 2003 West Virginia University Hospital ("WVUH") discharge summary indicating hospitalization from June 6, 2003 through June 30, 2003 for surgery related to a mesenteric vein thrombosis. She was discharged on June 30, 2003, placed on Coumadin for anticoagulation, and directed to follow-up with her primary care physician;

2.    A February 23, 2004 evaluation from Sobha Kurian, M.D., indicating no acute distress but hospitalization through February 25, 2004 for possible transient ischemic attack (TIA) symptoms, low international normalized ratio (INR), and to resolve complications with her Coumadin treatment;

3.    A July 12, 2004 physical exam by Dr. Kurian at the hematology/oncology department of WVUH, indicating a history of asthma, current medications of Advair, Albuterol inhaler and nebulizer, and Coumadin, and no further evidence of thrombosis since her surgery in June 2003. Dr. Kurian noted that Peters' chest and lungs were clear and recommended a follow-up in one year;

4.    A March 4, 2005 chest x-ray from WVUH indicating "no evidence of acute cardiopulmonary process;"

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

5.    A March 28, 2005 blood flow report from WVUH indicating no evidence of right lower extremity DVT or venous insufficiency within the limits of the examination;

6.    A March 30, 2005 discharge summary from WVUH indicating a hospitalization from March 28, 2005 through March 30, 2005 for treatment for cellulitis in her right leg, and that Peters was treated with antibiotics and discharged able to walk on her right leg;

7.    An August 2, 2005 discharge summary from Fairmont General Hospital ("FGH") indicating hospitalization from July 30, 2005 through August 2, 2005, with a principal diagnosis of left leg cellulitis, treatment with antibiotics, ambulatory and on regular diet at time of discharge. Peters was directed to have minimal exercise and encouraged to elevate her left leg. The discharge summary also noted that a Duplex ultrasound did not show any deep vein thrombosis;

8.    An August 6, 2005 discharge summary from WVUH indicating Peters was hospitalized from August 3, 2005 through August 6, 2005 for left leg cellulitis, treated with antibiotics and discharged on Augmentin and Percocet for pain. The discharge summary noted that

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

she came to WVUH because she was not satisfied with treatment she had received at FGH from July 30, 2005 through August 2, 2005;

9.    An August 10, 2005 discharge summary from WVUH indicating that Peters was re-hospitalized for left leg cellulitis from August 8, 2005 through August 10, 2005, treated with antibiotics and discharged with improved cellulitis. The discharge summary notes that Peters had taken only one dose of the Augmentin after her discharge, and that her failure to comply with her medicine instructions had resulted in the cellulitis becoming much worse;

10.   A September 20, 2005 report from Christopher Z. Villaraza II, M.D., of Grafton City Hospital ("GHC") indicating overnight admission to the hospital to evaluate left leg pain. Peters reported a history of asthma and use of Advair Diskus and Proventil MDI. Dr. Villaraza noted that Peters' chest and lungs were clear to auscultation bilaterally;

11.   A September 30, 2005 report from GCH's emergency department indicating complaints of wheezing and coughing, treatment with nebulizer, a Solumedrol injection and discharge in stable condition approximately one hour after being triaged;

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

12. An October 5, 2005 report from GHC indicating hospitalization from October 5, 2005 through October 6, 2005 for left leg cellulitis;

13. A January 3, 2006 report from Community Health Center ("CHC"), indicating complaints of a cold, wheezing, and coughing, assessment of chronic bilateral leg pain and asthmatic bronchitis, and a follow-up appointment in one month;

14. A February 2, 2006 Physical Residual Functional Capacity Assessment from Fulvio Franyutti, M.D., a State Agency Physician Consultant, indicating that Peters could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand at least two hours in an 8-hour workday, sit about six hours in an 8-hour workday, unlimited ability to push or pull other than as restricted in lift or carry category, occasional climbing, stooping or balancing, no kneeling, crouching or crawling, no manipulative, visual and communicative limitations, and must avoid extreme heat, cold, fumes, odors, gases, dust and poor ventilation. Dr. Fulvio reduced her RFC to sedentary;

15. A February 20, 2006 report from Tygart Valley Clinic ("TVC") indicating nebulizer treatments for asthmatic bronchitis;

16.  A February 20, 2006 report from Nancy L. Haislip-Craig, M.D., GCH, indicating hospitalization and treatment for asthmatic exacerbation, hypercoagulopathy, and migraine headaches. Dr. Haislip-Craig prescribed Prednisone, Avelox, and respiratory treatments of Proventil, Atrovent, and Advair;

17.  A February 23, 2006 GHC discharge summary from Dr. Haislip-Craig indicating that Peters was "doing much better" at the time of discharge and would be able to go home on outpatient therapy to finish her course of antibiotics and steroid taper, and noting no significant complications for this admission;

18.  A March 1, 2006 report from CHC following a check-up appointment for asthma, 1-2+ pitting edema, obesity, recurrent cellulitis and recommending a follow-up appointment in two months;

19.  A March 3, 2006 report from TVC indicating the asthmatic bronchitis was resolved;

20.  A March 26, 2006 report by Manish Sharma, M.D., indicating no lesions or cellulitis in both legs;

21.  A March 20, 2006 evaluation from Harakh V. Dedhia, M.D., West Virginia University Pulmonary Clinic ("WVUPC"), regarding complaints of shortness of breath, asthma, and reduced overnight pulse oximetry.  Examination revealed clear lungs, weight of 334

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

pounds. No formal pulmonary function tests were done to substantiate this diagnosis. Dr. Dedhia assessed

> [a] 33-year old morbidly obese white female who has been seen today for symptoms of shortness of breath and also clinical diagnosis of asthma, which has really never been substantiated and also reduced pulse ox on a trending overnight study. It is likely that her shortness of breath is multifactorial. While she may indeed have bronchial asthma, it is likely that her obesity is the main contributing factor to her shortness of breath. Also, her trending pulse ox study showed only minimal amount of time where her pulse oximetry was less than 88%. It is also likely based on her body habitus and symptoms of excessive daytime sleepiness that she does suffer from obstructive sleep apnea.

He recommended full pulmonary function testing, including lung volumes, DLCO and maximal inspiratory and expiratory pressures, referral to a sleep lab, a weight loss/rehabilitation program, and a follow-up appointment in four to six weeks;

22. An April 28, 2006 office note from TVC indicating complaints of wheezing, coughing, and congestion, treatment with Albuterol nebulizer breathing treatments and a Solumedrol injection and a diagnosis of asthmatic bronchitis. It also noted that Peters had a pulmonology appointment scheduled for the next week;

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

23.  A May 1, 2006 progress note from John E. Parker, M.D., WVUPC indicting lungs were clear to auscultation bilaterally. The results from Peters' pulmonary function studies were pre-bronchodilator FEV1 of 2.76, which was 85 percent of predicted, and a post-bronchodilator FEV1 of 3.04 liters.  Dr. Parker noted that Peters likely would have had a significant bronchodilator response if she had not been taking systemic corticosteroids, Advair, and Albuterol.  Dr. Parker assessed bronchial asthma, probable obstructive sleep apnea, allegic rhinitis, and gastroesophageal reflux disease, and scheduled a follow-up visit in six weeks;

24.  A May 2, 2006 sleep study report from John A. Young, M.D., West Virginia University Sleep Laboratory, indicating no significant problem with sleep-disordered breathing, no physiological sleep disruptors, and noting that, if Peters is only getting six hours of sleep per night, her feelings of tiredness may be the result of not getting enough sleep;

25.  A June 16, 2006 Psychiatric Review Technique from Bob Marinelli, Ed.D, indicating a diagnosis of major depressive disorder, moderate alcohol abuse, panic disorder without agoraphobia, with mild limitations in restriction of daily living, difficulties in maintaining social functioning, difficulties in

maintaining concentration, persistence and pace, and no episodes of decompensation. He also noted that her limitations did not satisfy the listing's "C" criteria;

26.   A June 21, 2006 note from TVC indicating complaints of shortness of breath, wheezing, and coughing and treatment for exacerbation of asthma with Albuterol nebulizer breathing treatments and Solumedrol injections, treatment for peripheral edema with lasix, and a prescription for a Prednisone taper;

27.   A July 20, 2006 note from TVC indicating complaints of shortness of breath, wheezing and coughing, and treatment for exacerbation of asthma with Albuterol nebulizer breathing treatments and Solumedrol injections;

28.   An August 4, 2006 Physical Residual Functional Capacity Assessment from Cindy Osborne, D.O., a State Agency Physician Consultant, indicating a diagnosis of asthma, morbid obesity and H/O cellutis.  Examination revealed Peters could occasionally lift 10 pounds, frequently lift less than 10 pounds, stand or walk at least two hours in an eight hour workday, sit about six hours in an eight hour workday, has unlimited ability to push or pull, can occasionally climb ramps or stairs, kneel, crouch or crawl, no stooping or balancing, no manipulative, visual or communicative

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

limitations, environmental limitations - must avoid concentrated exposure to extreme cold or heat, wetness and humidity, and avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation and hazardous machinery or heights. Dr. Osborne reduced the RFC to sedentary based on limitations related to obesity;

29. A September 5, 2006, clinic note from Tygart Valley Total Care Clinic ("TVTCC") indicating complaints of shortness of breath, wheezing and coughing and a statement from Peters that she had been seen in the emergency department on each of the three previous days. The note is unclear regarding what treatment, if any, she received;

30. An October 6, 2006 duplex scan vascular report from GHC indicating no evidence of deep venous thrombosis;

31. A November 6, 2006 report from UHA - Physician Office Center indicating Peters had an incisional hernia repair;

32. A November 29, 2006 report from UHA indicating Peters experienced a coughing spell that caused her hernia surgical drain site to open, resulting in a wound;

33. A January 3, 2007 report from Dr. Graves at UHA indicting wound vac therapy being used to treat the hernia wound dehiscence;

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

34.  A January 31, 2007 report from UHA indicating removal of the wound vac;

35.  A March 7, 2007 report from GCH's emergency department indicating admission at 11:57 P.M. due to complaints of shortness of breath and wheezing, treatment with a nebulizer, a Solumedrol injection, and discharge  at approximately 1:00 A.M. on March 8, 2007 in improved condition;

36.  A March 26, 2007 evaluation from Manish Sharma, M.D., WVU Department of Medicine regarding fluctuating PT and INR with high doses of Coumadin. The review of symptoms indicated no complaints of shortness of breath or coughing, and her lungs were clear upon physical examination;

37.  A March 21, 2007 report from Dr. Graves indicating the hernia surgery wound was resolving;

38.  A May 2, 2007 report from Dr. Graves indicating Peters was "feeling good," noting minimal drainage from the hernia surgery wound and describing the wound as "superficial" and decreasing in size;

39.  A May 2, 2007 evaluation from WVUH indicating a history of cellulitis with examination revealing no calf tenderness or edema;

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

40.   A May 8, 2007 note from TVTCC indicating complaints of shortness of breath, wheezing, and coughing, a diagnosis of asthmatic exacerbation and asthmatic bronchitis, received Albuterol nebulizer breathing treatments and Solumedrol injections with condition improving before she left the clinic;

41.   A May 21, 2007 note from TVTCC indicating complaints of shortness of breath, wheezing, and coughing, a diagnosis of asthmatic exacerbation and asthmatic bronchitis, treatment with Albuterol nebulizer breathing treatments and Solumedrol injections and noting improved condition before she left the clinic. Report also noted Peters did not use her home nebulizer before coming to the clinic.;

42.   A May 21, 2007 x-ray from TVTCC indicating no acute changes; and

43.   A May 22, 2007 note from TVTCC indicating complaints of shortness of breath, wheezing, and coughing, a diagnosis of asthmatic exacerbation and asthmatic bronchitis, treatment with Albuterol nebulizer breathing treatments and Solumedrol injections, and noting improved condition before leaving the clinic.

## VI.   <u>DISCUSSION</u>

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Peters argues that the magistrate judge erred when he concluded that the record contained substantial evidence to support the ALJ's findings regarding her residual functional capacity ("RFC"), her failure to meet the criteria of any listing, including Listing 3:03(B), and her credibility. She argues that the ALJ failed to properly consider the facts of her case, failed to properly apply the law, and failed to consider the actual argument she presented in support of her appeal.

Peters also contends that the magistrate judge erroneously made his own medical determination, rather than performing the required de novo review. In Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), the Fourth Circuit stated that the ALJ bears the ultimate responsibility for weighing the evidence and resolving any conflicts, and that, in reviewing for substantial evidence, a court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. (Emphasis added.)

42 U.S.C. § 405(g) provides that

> [t]he court shall have the power to enter,
> upon the pleadings and transcript of record, a
> judgment affirming, modifying, or reversing
> the decision of the Commissioner of Social

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

---

          Security, with or without remanding the cause
          for a rehearing.

As discussed below, the Court concludes that the magistrate judge performed a proper *de novo* review of the evidence of record, and found that the ALJ had correctly determined that Peters retained the RFC to perform sedentary work, failed to satisfy the requirements of any listing contained in 20 CFR Part 404, SubpartP, Appendix 1, and was not totally credible regarding her complaints of pain and functional limitations.

**A.**    **Residual Functional Capacity**

20 C.F.R. § 404.1545(a) provides:

> *Residual functional capacity*. Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is the most you can still do despite your limitations.

SSR 96-8p provides:

> RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. RFC does not represent the least an individual can do despite his or her limitations or

17

restrictions, but the most. RFC is assessed by adjudicators at each level of the administrative review process based on all of the relevant evidence in the case record, including information about the individual's symptoms and any "medical source statements" -- i.e., opinions about what the individual can still do despite his or her impairment(s)-- submitted by an individual's treating source or other acceptable medical sources.

RFC Assessment Must be Based Solely on the Individual's Impairment(s). The Act requires that an individual's inability to work must result from the individual's physical or mental impairment(s). Therefore, in assessing RFC, the adjudicator must consider only limitations and restrictions attributable to medically determinable impairments. It is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain, due to factors such as age or height, or whether the individual had ever engaged in certain activities in his or her past relevant work (e.g., lifting heavy weights.) Age and body habitus (i.e., natural body build, physique, constitution, size, and weight, insofar as they are unrelated to the individual's medically determinable impairment(s) and related symptoms) are not factors in assessing RFC in initial claims.

NARRATIVE DISCUSSION REQUIREMENTS

The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities,

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

_____

observations). In assessing RFC, the
adjudicator must discuss the individual's
ability to perform sustained work activities
in an ordinary work setting on a regular and
continuing basis (i.e., 8 hours a day, for 5
days a week, or an equivalent work
schedule)[7] and describe the maximum amount
of each work-related activity the individual
can perform based on the evidence available in
the case record. The adjudicator must also
explain how any material inconsistencies or
ambiguities in the evidence in the case record
were considered and resolved.

Here, the ALJ determined:

After careful consideration of the entire
record, the undersigned finds that the
claimant has the residual functional capacity
to perform a range of sedentary work, with
standing/walking for a total of two hours
during the eight-hour workday and sitting for
a total of six hours during the workday. She
can perform all postural movements
occasionally, except she cannot climb ladders,
ropes or scaffolds. She must avoid even
moderate exposure to fumes, dust, odors, gases
and pollutants and must avoid working around
moving plant machinery and unprotected
heights.

The ALJ reviewed all of the medical records regarding Peters'

mesenteric thrombosis surgery and recurring cellulitis, and

specifically noted the following history:

1. A June 6, 2003 discharge summary indicating
hospitalization and surgery for a mesenteric thrombosis and noting
that, on discharge, Peters was ambulatory and prescribed medication
was controlling her pain;

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

2.    A February 5, 2004 follow-up appointment indicating complaints of pain in the mid-abdomen occurring every two to three days;

3.    A July 12, 2004 follow-up appointment indicating no further evidence of thrombosis, intermittent swelling in her legs and minimal edema in the extremities, which Dr. Kurian noted was related to body habitus;

4.    A March 7, 2005 report from Dr. Kurian indicating difficulty in maintaining the Coumadin at a therapeutic level;

5.    A discharge summary for a hospitalization from March 28, 2005 through March 30, 2005 for treatment of cellulitis and a March 28, 2005 report from a right lower extremity venous duplex imaging, indicating no evidence of right lower extremity deep venous thrombosis or venous insufficiency;

6.    Records documenting treatment for cellulitis and left leg swelling for the period July 30, 2005 through August 2, 2005 that included a doppler duplex scan of the left leg revealing no evidence of deep vein thrombosis;

7.    Laboratory studies from August 13, 2005 and September 7, 2005, indicating INR levels were within normal range but Prothrombin time was in excess of the normal range;

8.    A September 20, 2005 report of hospitalization for complaints of pain in the left leg and noting a Doppler study of both legs that was negative for deep vein thrombosis;

9.    Reports from October 5, 2005 and October 20, 2005, indicating emergency room treatment for complaints of left leg pain and swelling;

10.   A March 20, 2006 report indicating trace bilateral lower extremity edema up to the knee;

11.   A May 1, 2006 report from an examination of the extremities indicating no edema;

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

12.  A November 2006 report from surgery for repair of an incisional hernia;

13.  A March 26, 2007 report from Dr. Sharma, diagnosing recurrent cellulitis in both legs and varicose veins; examination revealed 1+ edema in both legs but no lesions or cellulitis;

14.  A May 2, 2007 laboratory study indicating a prolonged Prothrombin time of 43.1 and an INR level of 4.5;

15.  A May 2, 2007 report indicating no calf tenderness or edema;

16.  A May 2, 2007 report from a follow-up examination indicating Peters was "feeling good" with minimal drainage from her wound that had significantly decreased in size and was no longer tender; and

17.  A May 21, 2007 laboratory study indicating a Prothrombin time of 32.0 and an INR level of 3.2.

Based on his thorough review of the medical records, the ALJ determined:

> The medical records establish that the claimant has not had any evidence of thrombosis since her surgery in June 2003. The records do establish that she has had been [sic] maintained on Coumadin since her surgery and that she has had some fluctuating Prothrombine time and INR levels. However, the undersigned finds that any residuals from the claimant's surgery in June 2003, including any nausea or weakness associated with fluctuating blood levels, and any impact on this condition attributable to the claimant's obesity have been adequately accommodated by limiting the claimant to the range of sedentary work detailed above.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

### 1. **Absenteeism**

Peters argues that absenteeism due to frequent medical appointments would prevent her from working full-time, and relies on her history of numerous medical appointments to prove that she would be unable to meet the requirements of a full-time position. The Commissioner's response to this argument is that Peters is not entitled to disability unless her inability to work is based on a medically determinable physical or mental impairment that is expected to result in death or last for a continuous period of at least 12 months.

The ALJ noted that the record does not contain any doctor report indicating inability to work because of numerous doctor appointments. He further noted that several of Peters' health problems appear to be improving, as a result of which the need for medical appointments may diminish, and that, in any event, any necessary appointments could be scheduled during her free time or at a time that would not require her to miss a full day of work.

### 2.   **Vocational Expert**

In support of her objection to the ALJ's RFC, Peters references the VE's response to the ALJ's hypothetical question

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

during the hearing, the ALJ asked the VE the following hypothetical

question:

Q.    I want you to consider a hypothetical person limited to
      sedentary work.  That can lift 10 pounds occasionally, less
      than 10 pounds frequently. Standing and walking should never
      be more than two hours in an eight-hour day, sitting, six
      hours in an eight-hour day, both with normal breaks.  Such an
      individual should never climb any ladders, ropes or scaffolds,
      or balance. Such a person would be able to occasionally climb
      ramps and stairs, stoop, kneel, crouch and crawl. Such a
      person should avoid even moderate exposure to fumes, dusts,
      odors, gases and pollutants, poor ventilation, and avoid the
      hazards of moving plant machine and unprotected heights.

      Now, just for the benefit of the record, in looking at
      the claimant's past work, would this hypothetical person,
      limited to sedentary, be able to do any of the work the
      claimant has done in the past?

A.    No, Your Honor.

Q.    All right. Would there be any jobs that exist in the national
      or regional economy that such an individual could perform,
      based on that hypothetical, the region to be defined by you.

                              . . .

A.    Your Honor, considering the, the hypothetical you've presented
      to me for comment, it would be my testimony that jobs would
      exist in the national economy, also in the State of West
      Virginia, consistent with, with that hypothetical, first,
      being that of a surveillance system monitor operator, 300,000
      jobs in the national economy, at least 1,000 jobs in West
      Virginia. Secondly, the position of an order clerk, unskilled,
      259,000 jobs in the national economy, 2,000 jobs minimally in,
      in West Virginia, and thirdly, the position of an information
      clerk, sedentary, unskilled, 287,000 jobs in the national
      economy, and at least 1,100 in the State of West Virginia. All

the jobs are sedentary, unskilled, and consistent with the DOT, Your Honor.

Q.  So basically, if an individual, if this hypothetical person required only unskilled work, those jobs are consistent, is that correct?

A.  Yes.

Q.  All right, now, consider that the claimant's testimony that we've heard in this case today is supported by her medical evidence of record, and based on the testimony and the medical evidence of record, she would have no ability to do any exertional level of work activity, and her ability to maintain attention, concentration and pace, to perform even unskilled jobs, would rise to the level of marked. By marked, I mean no ability to do any eight-hour work day, 40 hours a week, for a period of at least five days, and there would be absenteeism, and, well let's would there be jobs that such a person could perform?

A.  If that would be the case, Your Honor, there would be no jobs.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q.  If this hypothetical person that was going to do sedentary work, that was going to do the surveillance monitor system, and that person would have to elevate their leg due to swelling and edema as high as their heart for some period of time during the day, which I will say at least 30 minutes every hour, would that, would that eliminate those types of jobs.?

A.  No, hypothetically, that job could be performed by someone even in a wheelchair.

Regarding Peters' assertion that her doctors had told her "to

continually elevate her legs," the ALJ noted that he had found only

one reference in the record, the August 2, 2005 discharge summary

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

from FGH, where elevation of her left leg was recommended.
Furthermore, Peters had cited only two instances in the record
recommending that she elevate her leg: the August 2, 2005 discharge
summary from FGH following treatment for left leg cellulitis and
bullous impetigo, and the October 20, 2005 report from the GCH
emergency room visit where she requested treatment for pain in the
left leg.  The ALJ concluded

> [t]he medical records establish that the
> claimant has a history of treatment for
> recurrent cellulitis in the lower extremities
> and that she has also been diagnosed as having
> varicose veins. She has failed to document any
> extensive treatment for the varicose veins.
> Further the overall record establishes that
> the claimant's symptoms associated with her
> cellulitis, including her leg swelling, have
> been intermittent in nature. The undersigned
> finds that the claimant has failed to
> establish any period lasting 12 consecutive
> months during which her recurrent lower
> extremity cellulitis and varicose veins and
> any impact on these conditions attributable to
> her obesity have precluded her performance of
> the range of sedentary work detailed above.
> The undersigned further notes that the medical
> records fail to establish that claimant's
> treating sources have indicated that she must
> keep her legs elevated while seated on a
> continual basis. The undersigned has found
> only one reference to the need to elevate the
> legs. In this regard, when discharged on
> August 2, 2005, the claimant was advised to do
> minimal exercise and she was encouraged to
> elevate her left leg.

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**
───────────────────────────────────────────────

Based on the medical evidence, the magistrate judge concluded that the ALJ had properly determined that the record does not support Peters' assertion that she must continually elevate her legs.

### 3.    **Effects of Obesity**

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00I Respiratory System provides:

> Effects of obesity. Obesity is a medically determinable impairment that is often associated with disturbance of the respiratory system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with respiratory impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

Here, the ALJ considered the effects of Peters' obesity on her impairments and concluded:

> As required by Social Security Ruling 02-01P, in assessing the severity of the claimant's impairments at this step in the evaluation, the Administrative Law Judge has considered

26

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

the effects of her obesity. At a height of 65 inches, the claimant was reported to weigh 287 pounds on August 29, 2003, 328.6 pounds on February 23, 2004, 320 pounds on March 7, 2005, 324 pounds on June 16, 2005, 330 pounds on March 27, 2006, 317 pounds on January 24, 2007, and 329 pounds on June 4, 2007. Based on the claimant's reported height and weights, she had a Body Mass Index (hereinafter BMI) of 47.8 on August 29, 2003, 54.7 on February 23, 2004, 53.2 on March 7, 2005, 53.9, on June 16, 2005, 54.9 on March 27, 2006, 52.7 on January 24, 2007, and 54.7 on June 4, 2007. As the claimant's BMIs are all in excess of 40, classified as Level III or 'extreme' obesity, they represent the greatest risk for developing obesity-related impairments. In the claimant's case, her severe impairments are aggravated by her obesity. However, the medical records fail to establish that the claimant has required an assistive device during the period in question. Further, the claimant only documented emergency room treatment for an asthma attacks occurred [sic] in September 2005 and her only documented inpatient treatment was for a period of four days in February 2006. In this regard, although the claimant reported to Dr. Parker on May 1, 2006, that she had required several emergency room visits since her last visit to the Pulmonary Clinic on March 20, 2006, the claimant has failed to document these alleged visits. Dr. Parker reported that the claimant's lungs were clear to ausculation bilaterally. . . . <u>The overall record fails to establish that the claimant's combined impairments are of a level of severity to satisfy the requirements of any of the impairments detailed in Appendix 1</u>.

(Emphasis added.)

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

The ALJ reviewed this record and recognized that Peters' extreme obesity can adversely effect her pulmonary and respiratory conditions.

**B.    Listing 3.03B**

Peters also contends that the magistrate judge erroneously concluded that the ALJ had satisfied his legal duty to consider and discuss all relevant evidence related to her bronchial asthma prior in determining that her impairments, alone or in combination, failed to satisfy the requirements of any of the impairments contained in Appendix 1, and, specifically, in Listing 3.03B. She further contends that the magistrate judge wrongly relied on his own factual analysis of the medical evidence in determining that the record contained substantial evidence to support the ALJ's finding. She argues that the ALJ limited his consideration to only two of her documented asthma attacks, those in September 2005 and February 2006.

Pursuant to Sulivan v. Zebley, 493 U.S. 521, 532 (1990), an individual "whose impairment meets or equals the criteria of an impairment listed in the regulations is presumed disabled at step three of the sequential evaluation. Sullivan further provides that

> [t]o meet a listing, an individual's
> impairments must match all of the specified
> medical criteria that define a listed
> impairment.

Id. at 530

Listing 3.03B provides:

> **3.03 Asthma. With:**
>
> **B. Attacks (as defined in 3.00C), in spite of**
> **prescribed treatment and requiring physician**
> **intervention, occurring at least once every 2**
> **months or at least six times a year.** Each
> inpatient hospitalization for longer than 24
> hours for control of asthma counts as two
> attacks, and an evaluation period of at least
> 12 consecutive months must be used to
> determine the frequency of attacks.

To satisfy Listing 3.03B, the record must contain objective

medical evidence documenting asthma attacks and treatment that meet

the criteria defined in Listing 3.00C. Listing 3.00C provides:

> **C. Attacks of asthma...as referred to in**
> **paragraph B of 3.03...are defined as prolonged**
> **symptomatic episodes lasting one or more days**
> **and requiring intensive treatment**, such as
> intravenous bronchodilator or antibiotic
> administration or prolonged inhalational
> bronchodilator therapy in a hospital,
> emergency room or equivalent setting.
> Hospital admissions are defined as inpatient
> hospitalizations for longer than 24 hours.
> The medical evidence must also include
> information documenting adherence to a
> prescribed regimen of treatment...For asthma,
> the medical evidence should include

29

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

---

> spirometric results obtained between attacks
> that document the presence of baseline airflow
> obstruction...

(Emphasis added.)

Here, the ALJ determined that

> . . . the objective findings related to the
> claimant's residuals from her surgery and
> treatment of mesenteric thrombosis with
> ischemic bowel fails to establish that this
> condition is of a level of severity to satisfy
> the requirements of any of the impairments
> detailed in Section 4.00 or 5.00 of Appendix
> 1. Further, the claimant's recurrent lower
> extremity cellulitis and bilateral varicose
> veins are not attended by clinical findings
> that satisfy the requirements of Section 4.11
> of Appendix 1, dealing with chronic venous
> insufficiency. The claimant has failed to
> establish that she has had asthma attacks
> during the period in question occurring with
> the frequency required by Section 3.03 of
> Appendix 1.

SSR 02-1p provides guidance on SSA policy concerning the evaluation of obesity in disability claims filed under Titles II and XVI of the Social Security Act. Specifically, it provides:

> How does Obesity Affect Physical and Mental
> Health?
>
> Obesity is a risk factor that increases an
> individual's chances of developing impairments
> in most body systems. It commonly leads to,
> and often complicates, chronic diseases of the
> cardiovascular, respiratory, and
> musculoskeletal body systems. . . .

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

The fact that obesity is a risk factor for other impairments does not mean that individuals with obesity necessarily have any of these impairments. <u>It means that they are at greater than average risk for developing the other impairments.</u>

It further provides:

We will consider obesity in determining whether:

The individual has a medically determination impairment.

The individual's impairment(s) is severe.

The individual's impairment(s) meets or equals the requirements of a listed impairment in the listings.

As required by SSR 02.01p, during his evaluation of Peters' claim the ALJ considered the effects of her obesity in assessing the severity of her impairments, and determined that the medical evidence documented that all of Peters' Body Mass Index("BMI") measurements were in excess of 40, and that, at a height of 65 inches, with that BMI she is considered to be extremely obese. Significantly, the ALJ noted the report from Dr. Dedhia indicating that "while Plaintiff may have bronchial asthma, it is likely that her obesity is the main contributing factor to her shortness of breath."

### ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

On May 1, 2006, Dr. Parker at the West Virginia University Pulmonary Clinic reported that Peters' lungs were clear to auscultation bilaterally. He documented pulmonary function studies of a pre-bronchodilator FEV1 of 2.76, which was 85 percent of predicted, and a post-bronchodilator FEV1 of 3.04 liters. Further, a May 2, 2006 sleep study revealed no significant problem with sleep-disordered breathing. The ALJ also noted that, although she reported several emergency room visits to Dr. Parker, the only documented "inpatient treatment" for asthma attacks for Peters was in February 2006, and the only documented emergency room treatment meeting the requirements of Listing 3.03B occurred in September 2005.

In the ALJ's thorough discussion of Peters' treatment for asthma-related incidents, he noted:

> The claimant has documented limited treatment for her bronchial asthma during the period in question. Her lungs were clear when examined on July 12, 2004, The claimant had a chest x-ray on March 4, 2005, that showed no evidence of acute cardiopulmonary process. Her lungs were clear to ausculation bilaterally when hospitalized on September 20, 2005. Thereafter, on September 30, 2005, the claimant received emergency room treatment for an asthma attack. The claimant was also trated for an asthmatic exacerbation while hospitalized during the period February 20,

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

2006 through February 23, 2006. While
hospitalized the claimant had a CT scan of the
chest that revealed no pulmonary emboli. The
claimant was reported to be much less short of
breath at the time of discharge.

He also specifically noted the following:

1.  A February 2006 report that indicated the lungs were
    clear, a weight of 334 pounds, recommendation and
    counseling regarding the benefits of a weight loss
    program and opining that "the claimant's obesity was the
    main contributing factor to her shortness of breath;"

2.  A March 20, 2006 report from the Pulmonary Clinic that
    indicated a ten year history of treatment with Albuterol
    and Advair for bronchial asthma, a history of shortness
    of breath on exertion;

3.  A June 21, 2006 note from TVC indicating complaints of
    shortness of breath, wheezing, and coughing and treatment
    for exacerbation of asthma with Albuterol nebulizer
    breathing treatments and Solumedrol injections, treatment
    for peripheral edema with lasix and given Prednisone
    taper;

4.  A July 20, 2006 report from TVC indicating complaints of
    shortness of breath, wheezing, and coughing and treatment
    for exacerbation of asthma with Albuterol nebulizer
    breathing treatments and Solumedrol injections;

5.  A September 5 2006 note clinic note frm TVTCC indicating
    complaints of shortness of breath, wheezing and coughing
    and a statement from Peters that she had been seen in the
    emergency department on each of the three previous days.
    The note is unclear regarding what treatment, if any, she
    received;

6.  A March 26, 2007 report from Dr. Sharma indicating no
    shortness of breath, coughing and clear lungs;

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

7.   A May 8, 2007 report that indicated scattered expiratory wheezes throughout, worse in the upper fields, a diagnosis of asthma exacerbation. Significantly, the ALJ noted that this was the first documented treatment for pulmonary complaints following her September 6, 2006 treatment;

8.   A May 21, 2007 report that indicted expiratory wheezing, a diagnosis of asthmatic bronchitis, and an x-ray on that date revealed no acute changes; and

9.   A May 22, 2007 report that indicated mild and expiratory wheeze.

Peters argues that her medical history contains eleven asthma related incidents, including one hospital admission, which, pursuant to 3.03B, counts as two asthma attacks. She relies on the following asthma incidents, spanning a period longer than the required twelve month time frame, to prove that she meets the criteria for Listing 3.03B: 1) September 30, 2005, emergency room visit, 1 hour duration; 2) February 20, 2006, clinic visit; 3) February 20, 2006 through February 23, 2006, hospital admission (counts as 2); 4) April 28, 2006, clinic visit; 5) June 21, 2006, clinic visit; 6) July 20, 2006 clinic visit; 7) September 5, 2006, clinic visit; 8) March 8, 2007, emergency room visit, 1 hour duration; 9) May 8, 2007, clinic visit; 10) May 21, 2007, clinic visit; and 11) May 22, 2007, clinic visit.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

After reviewing all of the medical evidence of record, the magistrate judge determined that the ALJ had correctly analyzed and reviewed such evidence prior to finding that Peters had failed to satisfy the criteria of Listing 3.03B. As the ALJ noted, the majority of Peters' asthma-related incidents were resolved through an hour or two of treatment and, therefore, failed to satisfy the requirement in Listing 3.03B that the attack last one or more days. Moreover, the only incidents meeting the requirement of Listing 3.03B occurred on February 20, 2006 through February 23, 2006, and possibly May 21, 2007 through May 22, 2007.

The magistrate judge determined that the medical evidence of asthma-related visits to the emergency room or clinic supported a finding of three possible asthma attacks. He further noted, however, that those attacks did not occur within the required twelve month time frame. Thus, they did not satisfy the criteria of Listing 3.03B.

Listings 3.03B and 3.00 also require that Peters adhere to a prescribed regimen of treatment for her asthma. Significantly, however, the treatment notes from her May 21, 2007 asthma attack reflect that she did not use her home nebulizer treatment before going to the clinic. The medical records also establish that,

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

despite strong counseling and a recommendation from Dr. Dedhia on March 20, 2006 to enter a weight loss program because her obesity was the main contributing factor to her shortness of breath, Peters never undertook a prescribed weight loss program.

Importantly, the magistrate judge noted as well that no treating, examining, or State Agency physician had opined that Peters met or equaled the requirements of a listed impairment. Peters, nevertheless, argues that the magistrate judge made his own medical determination, rather than performing the required de novo review. While the magistrate judge may have documented his findings succinctly, he did thoroughly review and consider the evidence of record, and, in this Court's opinion, correctly concluded on de novo review that the record contains substantial evidence to support the ALJ's determination that Peters' impairments, when considered alone or in combination, do not satisfy or medically equal the requirements of any listing contained in 20 C.F.R. Part 404, Subpart P, Appendix 1 including Listing Impairment 3.03B.

**C.   Credibility**

Peters also contends that the ALJ failed to properly consider her credibility. SSR 96-7P provides:

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

The regulations describe a two-step process for evaluating symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms...

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

in 20 C.F.R. § 404.1529(c)(4) and § 416.929(c)(4)...

When additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements. In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and § 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements: 1. The individual's daily activities; 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. Factors that precipitate and aggravate the symptoms; 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

(Emphasis added).

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

The ALJ found that Peters was not completely credible:

> In light of the objective findings detailed
> above, the undersigned finds that the
> claimant's complaints of disabling pain and
> functional limitations are not fully credible.
> The claimant's daily activities, as detailed
> above, are consistent with an ability to
> perform a range of sedentary work. Although
> the claimant has testified that her husband
> does the cooking the undersigned notes that
> the claimant's husband is unemployed. As noted
> above, the claimant has failed to follow the
> advice that she lose weight to help with her
> pulmonary condition. The claimant had failed
> to document any mental health treatment for
> the alleged anxiety and she only recently
> started taking Lexapro for a mood disorder.

The ALJ evaluated Peter's credibility as prescribed in the two-step process of SSR 96-7p and 20 C.F.R. §§ 404.1529 and 416.929, and concluded that her medically determinable impairments could reasonably be expected to cause some of her symptoms. At step two, however, he found that the evidence in the record did not support Peters' reports of disabling pain and functional limitations.

First, the ALJ reviewed Peters' daily activities, taking note of the fact that, in December 2005, her daily activities consisted of trying to make her husband and son something for dinner and trying to do other things that wives and mothers do, taking caring

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

of her own personal needs, cooking breakfast, lunch and dinner
daily for 1-2 hours, depending on how she feels, doing two or three
hours of laundry, dusting, visiting her mother four or five times
per week, shopping once a week for food and other necessities for
a couple hours, paying bills and handling a checking and savings
account, watching television every day, painting ceramics once a
week, and attending church. She also reported that she could lift
ten to fifteen pounds, did not require any assistive device for
ambulation, and was able to pay attention and follow written or
spoken instructions.

During a March 2006 psychological evaluation with Martin
Levin, M.A., Peters reported that she typically arose at 7:00 A.M.
to get her son off to school, and then sometimes went to
appointments or around town or just "veg[ged] out." She also
reported doing housework, reading her Bible, going to a dinner and
a movie with her husband, having dinner with her family, helping
her son with his homework, going to bed at 11:00 P.M., taking care
of her own personal grooming, and regularly attending church with
her husband and son. In September and October 2006, pursuant to a
requirement of the state public assistance program, she volunteered

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

approximately twenty hours at a hospital and read to the patients, or helped them put calendars together.

At the August 2007 hearing before the ALJ, Peters testified she could routinely lift a gallon of milk, had no problems with her memory, attempts to sweep and mop, and sleeps in a second floor bedroom.

From all of this, the magistrate judge concluded that there is substantial evidence in the record to support the ALJ's finding that Peters is not entirely credible in her assertions of disability. The Court agrees.

## VII. <u>CONCLUSION</u>

Following its <u>de novo</u> review of Peters' objections to the R&R, the Court concludes that she has not raised any issues that were not thoroughly considered by Magistrate Judge Joel in his R&R. Moreover, the Court is of the opinion that the R&R accurately reflects the law applicable to the facts and circumstances in this action. Therefore, it accepts Magistrate Judge Joel's R&R in whole and **ORDERS** that this civil action be disposed of in accordance with the recommendation of the Magistrate Judge. Accordingly, the Court

1.  **GRANTS** the defendant's motion for Summary Judgment (Dkt. No. 17);

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

2.    **DENIES** the plaintiff's motion for Summary Judgment (Dkt.

No. 12); and

3.    **DISMISSES WITH PREJUDICE** and **RETIRES** this civil action

from the docket of this Court.

Pursuant to Fed.R.Civ.P. 58, the Court directs the Clerk of

Court to enter a separate judgment order and to transmit copies of

this Order to counsel of record.

If a petition for fees pursuant to the Equal Access to Justice

Act (EAJA) is contemplated, the plaintiff is warned that, as

announced in <u>Shalala v. Schaefer</u>, 113 S.Ct. 2625 (1993), the time

for such a petition expires in ninety days.

DATED: March 31, 2010.

                                        /s/ Irene M. Keeley
                                        IRENE M. KEELEY
                                        UNITED STATES DISTRICT JUDGE